## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 13 2016, 8:51 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark F. James
Anderson Agostino & Keller, PC
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henki
Abigail R. Recker
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

E.S., Ed.B and El.B (Minor Children),

And

B.B. (Father),

*Appellant-Respondent,*

     v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

December 13, 2016

Court of Appeals Case No. 71A03-1603-JT-684

Appeal from the St. Joseph Probate Court

The Honorable James Fox, Judge

Trial Court Cause Nos. 71J01-1402-JT-7, 71J01-1402-JT-8, and 71J01-1402-JT-9

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Respondent, B.B. (Father), appeals the termination of his parental rights to his two minor children, Ed.B. and El.B.

We reverse.

## ISSUE

Father raises one issue on appeal, which we restate as follows: Whether the trial court clearly erred in terminating Father's parental rights.

## FACTS AND PROCEDURAL HISTORY

In early 2012, Father and his wife, S.B. (Mother), were living in Mishawaka, St. Joseph County, Indiana, with their children: E.S., born on January 4, 2005, and Ed.B., born on September 3, 2010. Father is not the biological parent of E.S.; however, E.S. was never made aware of this fact, and Father always treated her as if she was his biological child.[1] Around this time, the Indiana Department of Child Services (DCS) became involved with the family regarding allegations of domestic violence between Father and Mother. In

---

[1] As E.S. is neither biologically nor legally Father's child, he did not have any parental rights with respect to her, and she is therefore not a subject of this appeal. With respect to E.S., on February 29, 2016, the trial court terminated the parental rights of Mother and E.S.'s biological father. Additional facts pertaining to E.S. are included where appropriate. We further note that while Mother's parental rights to the three children involved in this case were terminated, she is not a party to this appeal.

September of 2012, DCS closed the case due to the parents' successful compliance with their case plans.

[5] However, just two months later, on November 5, 2012, DCS received a report that Father and Mother were both being arrested—Father for growing marijuana in the backyard and Mother on outstanding warrants, thus leaving nobody to care for E.S. and Ed.B. Accordingly, DCS intervened and placed E.S. and Ed.B. in the care of Father's mother (a licensed foster care provider). During DCS' investigation, Father reported that he grew the marijuana so that he and Mother could smoke it, but he claimed that he did not sell it to others. DCS observed that the family home was in disarray, with food and soiled diapers littering the floor. On November 7, 2012, DCS filed a petition alleging E.S. and Ed.B. to each be a child in need of services (CHINS), and the trial court adjudicated them as such the same day.

[6] On December 10, 2012, the trial court, following a dispositional hearing, issued a dispositional order in which it directed Father to participate in parental reunification services. In particular, the trial court ordered Father to complete a substance abuse assessment and follow all recommendations; submit to random drug screens; abstain from drug and alcohol use; and participate in home-based parent-aide services. Also that day, because both Father and Mother had already been actively participating in the services recommended by DCS since the children's removal, the trial court ordered that E.S. and Ed.B. be returned to the care of Father and Mother for a trial home visit.

[7] On January 8, 2013, Mother gave birth to her second child with Father, El.B. At the time, parents were compliant with their DCS services. However, on April 16, 2013, DCS received a new report of concerns regarding Father and Mother. In particular, the report alleged that Father had yelled at three-month-old El.B. for refusing to take her bottle, slapped eight-year-old E.S., and pushed two-year-old Ed.B. to the ground. Father had also reportedly pushed Mother hard enough that Mother fell onto E.S.[2] The report further indicated that Mother was continuing to abuse alcohol. Thus, on April 17, 2013, DCS removed the children from their parents' custody and placed them, again, with Father's mother. On April 18, 2013, DCS filed a petition alleging El.B. to be a CHINS, and she was adjudicated as such the same day. On April 29, 2013, the trial court issued a new dispositional order as to El.B. and modified the dispositional order concerning E.S. and Ed.B., directing Father to participate in individual and family therapy; submit to random drug screens; abstain from drug and alcohol use; participate in home-based parent-aide services; and participate in visitation. Father's visits were to be supervised.

[8] On May 9, 2013, DCS discovered that Father had been living with the children in his mother's home and that Father's mother had also allowed both parents to have unsupervised access to the children contrary to the court's mandate.

---

[2] DCS' reports contain allegations of Father's physical aggression toward the three children; however, testimony from the DCS family case manager indicates that while Father and Mother were physically abusive to each other, this conduct did not extend to the children. No criminal charges were filed or protective orders obtained against either Father or Mother.

Accordingly, DCS removed the children from their relative placement and on May 15, 2013, placed them in a foster home, where they currently reside. Since being placed in foster care, Ed.B. has received therapies to deal with his behavioral issues and speech difficulties, and E.S. has also been involved in therapy. El.B., who was only four months old at the time she was placed with the foster parents, has developed normally. The foster parents have enrolled the children in activities, and they maintain a structured routine for them. Although the children—particularly E.S. and Ed.B.—miss their parents, all three are doing well in their foster placement, and the foster parents wish to adopt them.

[9] Following the children's placement in foster care, Father fully participated in his case plan with DCS and was progressing toward reunification. He completed his substance abuse assessment and treatment, and all of his drug screens were negative. Father also completed a batterer's intervention program. He regularly attended his therapy sessions and consistently visited with the children. DCS noted that Father interacted appropriately with the children, and he was bonded to all three. On multiple occasions, the foster parents invited Father to their home to interact with the children and to work on his parenting skills in preparation for caring for the children on his own, which Father accepted. Father also maintained employment, and in June of 2013, he purchased a home in the Village Green Mobile Home Park in Mishawaka. On the other hand, Mother struggled with her sobriety and eventually became non-

compliant with her DCS services. As a result, Mother's visitation with the children was suspended.

[10] Based on the time the children had been removed from the home, on February 4, 2014, DCS filed petitions to terminate Father's parental rights to Ed.B. and El.B. Nevertheless, DCS continued to offer services to Father with a concurrent goal of reunification. On April 28, 2014, the trial court reduced the supervision level of Father's visitation to an intermittent basis. On June 16, 2014, Father's visitation with all three children was increased to include an overnight visit on the weekends with intermittent supervision. At DCS' request, the trial court agreed that if these visits went well, Father could begin unsupervised visits on July 16, 2014.

[11] Despite his apparent progress, Father never reached the level of unsupervised visits. Although Father was excited about the visits and "was really putting forth the effort in making sure he was more engaged with the children" and "was willing to try to learn different parenting techniques," various issues would arise during the visits that caused DCS and the visitation supervisor to be skeptical about Father's ability to keep all three children safe without any assistance. (Tr. pp. 64, 67). As the visitation supervisor described, Father

> kind of had tunnel vision. You tell him an incident that he
> needed to work on and he would work on that particular
> incident, but he would seem to have difficulty in just knowing
> when the next incident arrives, and you talk to [Father] and he'd
> work on that incident.

(Tr. p. 64). For instance, DCS and the visitation supervisor had to instruct Father on certain safety issues, such as securing paint supplies (after El.B. got into a bucket of paint) and not leaving power tools within reach of the children. Father also became overwhelmed, and he struggled to give proper attention to all three children as his attempts to redirect Ed.B.'s misbehavior consumed a large portion of the visits. In fact, the foster parents noticed that El.B. would sometimes return from visits with a diaper rash. On at least one occasion, Father threatened Ed.B. with physical discipline despite the DCS safety plan's prohibition of this form of punishment. There were also concerns about Father's inability to set appropriate boundaries for the children, such as being able to "tell[] the children no about something." (Tr. p. 177). In addition, it was apparent to the foster parents that E.S. was not getting a sufficient amount of sleep. It was later discovered that Father allowed E.S. to sleep on the couch, and she would stay up late watching television. Also, given that E.S. was maturing, the visitation supervisor had to coach Father about not bathing the three children together.

[12] Father also demonstrated struggles in his relationship with Mother. In particular, Father's therapist identified co-dependency as a significant issue. Although noting that co-dependency is difficult to define, Father's therapist described it as

> [a] way to appease your own anxiety by making those around you happy. It's being controlled while controlling others. It is the extreme need for approval. You struggle to find happiness if you're not tied to someone who is in need of you, needing

rescue. They receive satisfaction in helping others and feeling needed.

(Tr. p. 32). As a result, Father prioritized Mother's needs and desires over the needs of himself and the children. To illustrate, when Mother had been drinking prior to a scheduled visit with the children, Father declined to notify the service providers of the situation, thereby "let[ting] [her] put the children in jeopardy." (Tr. p. 179). Because his relationship with Mother was detrimental to his relationship with the children, DCS repeatedly made it clear to Father that he needed to become independent of Mother by working with his therapist on the co-dependency issues and by ceasing contact with her. On June 23, 2014, Father and Mother divorced. However, even after the divorce, Father continued to pay Mother's bills and would call her "obsessively." (Tr. p. 34). When Mother would attempt to move on with a new relationship, Father "would do what he could to" sabotage that relationship in order "to turn the attention back to him" and to "be there for her." (Tr. p. 34). Moreover, it was discovered that Father was surreptitiously allowing Mother to be present during his visits with the children, and he instructed E.S. to lie to DCS and the service providers about this fact. On November 19, 2014, the trial court suspended Father's visitation with the caveat that visitation would resume if recommended by his therapist and E.S.'s therapist. With the exception of one therapeutic visit in December of 2014, during which Father apologized to E.S. because of "the position that he had put her in" by having her lie for him, Father has not had any contact with the children. (Tr. p. 168).

[13]     On October 22, 2015, November 5, 2015, and November 6, 2015, the trial court conducted a hearing on DCS' termination petitions. On the first day of the hearing, before the presentation of any evidence, Father filed a motion to dismiss DCS' termination petitions. Father asserted that DCS had not presented a *prima facie* case to support the elements required for terminating a parent's rights. Father also alleged that he "was denied his constitutional right to due process by [DCS], both substantively, through its use of arbitrary and subjective measures throughout its handling of the CHINS case, and procedurally, through its failure to afford Father opportunities to confront evidence, or lack thereof, of conduct that caused [DCS] to take those actions." (Appellant's App. p. 28). The trial court denied Father's motion and proceeded with the hearing.

[14]     The DCS family case manager and the children's court appointed special advocate (CASA) both recommended terminating Father's parental rights as being in the best interests of Ed.B. and El.B. The CASA's opinion was based on her belief that Ed.B. and El.B. were well-settled in the foster home. DCS acknowledged that Father had remedied the issues that initially led to the children's removal from the home—*i.e.*, the marijuana growing operation and the domestic violence; however, Father's therapist testified that he had failed to resolve his co-dependency issues and had only acknowledged that his co-dependency was a detriment in the two weeks immediately preceding the termination hearing. Father's therapist opined that Father's co-dependency would affect his ability to make good decisions for Ed.B. and El.B. At the close

of DCS' case-in-chief, Father moved for judgment on the evidence, repeating his earlier assertion "that DCS has not presented a *prima faci[e]* case and that there is no clear and convincing evidence to support its claims that [F]ather's parental rights should be terminated." (Tr. p. 259) (Italics added). After hearing argument from all parties, the trial court denied Father's motion. On February 29, 2016, the trial court issued its Order, terminating Father's parental rights to Ed.B. and El.B. In its Order, the trial court determined that "it is unlikely that the reasons for the removal of the child[ren] will be remedied"; the "continuation of the parent child relationship would pose a threat to the child[ren]"; termination is in the children's best interests; and DCS has established a satisfactory plan of adoption following the termination of parental rights. (Appellant's App. p. 57).

[15] Father now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

[16] "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty issues.'" *S.L. v. Ind. Dep't of Child Servs.*, 997 N.E.2d 1114, 1122 (Ind. Ct. App. 2013) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). As a matter of fact, "the parent-child relationship is 'one of the most valued relationships in our culture.'" *Id.* (quoting *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010)). As such, the Fourteenth Amendment to the United States Constitution protects "the traditional right of parents to establish a home and raise their children." *Id.* Yet, "parental rights are not

absolute and must be subordinated to the child's interests." *Id.* (internal quotation marks omitted) (quoting *In re I.A.*, 934 N.E.2d at 1132). Thus, parental rights may be terminated if the "parents are unable or unwilling to meet their parental responsibilities." *In re G.Y.*, 904 N.E.2d 1257, 1259-60 (Ind. 2009). We recognize that "termination of parental rights remains an extreme measure and should only be utilized as a last resort when all other reasonable efforts to protect the integrity of the natural relationship between parent and child have failed." *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 646 (Ind. 2015) (internal quotation marks omitted).

[17] On review of the termination of parental rights, our court does not reweigh evidence or assess the credibility of witnesses. *Id.* We consider the evidence and any reasonable inferences that are favorable to the judgment. *Id.* Furthermore, the trial court issued specific findings of fact and conclusions thereon in granting DCS' petition to terminate Father's parental rights. Accordingly, our review is two-fold: "[f]irst, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment." *In re G.Y.*, 904 N.E.2d at 1260. We "shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A). We will find clear error only "if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *In re G.Y.*, 904 N.E.2d at 1260 (quoting *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005)).

## II. *Termination of Parental Rights Statute*

In order to terminate a parent's rights, DCS must prove:

(A) that one (1) of the following is true:

  (i)    The child has been removed from the parent for at least six (6) months under a dispositional decree.

  (ii)   A court has entered a finding under [Indiana Code section] 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required . . . .

  (iii)  The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a [CHINS] . . . ;

(B) that one (1) of the following is true:

  (i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

  (ii)   There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

  (iii)  The child has, on two (2) separate occasions, been adjudicated a [CHINS];

> (C) that termination is in the best interests of the child; and
>
> (D)    that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).  DCS bears the burden of establishing each of these elements by clear and convincing evidence.  *In re G.Y.*, 904 N.E.2d at 1260.  "Clear and convincing evidence need not reveal that the continued custody of the parents is wholly inadequate for the child's very survival.  Rather, it is sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody."  *Id.* at 1261 (citation omitted) (internal quotation marks omitted) (quoting *Bester*, 839 N.E.2d at 148).

[19]   On appeal, Father does not dispute that the children were removed from the home for the requisite period of time or that DCS has established a satisfactory plan for the care and treatment of the children.  Instead, he disputes the trial court's determinations that the conditions resulting in the children's removal will not be remedied and that the continuation of the parent-child relationship poses a threat to the children's well-being.  He also appears to challenge the trial court's determination that termination of his parental rights is in the best interests of Ed.B. and El.B.

## A.  *Remediation of Conditions*

[20]   In determining whether there is a reasonable probability that conditions will not be remedied, we engage in a two-step analysis:  first, we must identify what

conditions led to the children's "placement and retention in foster care"; second, we must determine whether there is a reasonable probability that those conditions will not be remedied. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). In making these decisions, "the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions—balancing a parent's recent improvements against habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation." *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (citation omitted) (internal quotation marks omitted) (quoting *Bester*, 839 N.E.2d at 152; *K.T.K.*, 989 N.E.2d at 1231). "Habitual conduct may include 'criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment.'" *K.E.*, 39 N.E.3d at 647. DCS "is not required to provide evidence ruling out all possibilities of change; rather, it need only establish that there is a reasonable probability that the parent's behavior will not change." *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013) (internal quotation marks omitted), *trans. denied*.

[21] In this case, the trial court concluded that "it is unlikely that the reasons for the removal of the child[ren] will be remedied." (Appellant's App. p. 57). In support of this determination, the trial court made sparse findings.[3] The trial

---

[3] Although not an issue raised by Father, we are troubled by the trial court's paltry findings and conclusions. Indiana Code section 31-35-2-8(c) requires a trial court to "enter findings of fact that support the entry of the conclusions." A trial court's findings of fact and legal conclusions are crucial to our ability to conduct a

court simply noted that the children were adjudicated CHINS and removed from the home based on allegations of Father growing and using marijuana and due to domestic violence between the parents. The trial court also found that Father, based on the fact that he allowed Mother to visit with the children and "admitted to an ongoing sexual relationship with Mother," "demonstrates a co-dependent attitude[] and does not appear likely to change." (Appellant's App. p. 56). Finally, the trial court found that while Father has "made some progress in therapy, [he is] unlikely to progress to the point where reunification is possible." (Appellant's App. p. 57).

[22] Father does not challenge the sufficiency of the trial court's findings. Instead, he points out that

> the children were removed initially because of allegations of substance use. Subsequently there was an allegation of domestic violence. Several witnesses for DCS testified that Father completed [the batterer's intervention program], completed parenting classes, was attentive to the children's needs, and that the conditions that led to removal of the children had been remedied.

proper review, and without adequate findings and conclusions, we are unable to discern whether the court terminated a parent's rights based on a thorough consideration of the statutory requirements. "A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is . . . a commanding one." *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016) (quoting *Santosky v. Kramer*, 455 U.S. 745, 759 (1982)). In fact, our court recently remanded a case in which the *same trial court* terminated a mother's parental rights because the trial court's findings were even more inadequate than in the present case. *See In re Involuntary Termination of Parent-Child Relationship of N.G.*, 2016 WL 5852896 (Ind. Ct. App. Oct. 6, 2016). Here, the trial court's cursory assertions that the grounds for termination have been satisfied are unsupported by specific facts based in the evidence. However, in light of judicial efficiency and the interests at stake, we elect to address this case on its merits rather than remand.

(Appellant's Br. p. 9) (citations omitted).  Because "the factors identified by the trial court as conditions that will not be remedied [*i.e.*, Father's co-dependency] aren't the same conditions that led to DCS' decision to place the children in foster care in the first place," Father insists that the trial court erred in its determination.  (Appellant's Br. p. 10).  Furthermore, Father posits that "any conditions imposed by DCS regarding the co-dependency relationship were never part of a court order."  (Appellant's Br. p. 8).

[23]  Father relies on our supreme court's recent decision of *In re V.A.*, 51 N.E.3d at 1148, in which it mentioned that "the factors identified by the trial court as conditions that will not be remedied are relevant only if those conditions were factors in DCS' decision to place [the child] in foster care in the first place." (alteration in original) (quoting *In re I.A.*, 934 N.E.2d at 1134).  We agree that there is no dispute that Father remedied the conditions which initially led to the children's removal from the home.  However, the plain language of Indiana's termination statute makes it clear that "it is not just the basis for the initial removal of the child that may be considered for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the *continued placement outside of the home*."  *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005) (emphasis added), *trans. denied*; *see* I.C. § 31-35-2-4(b)(2)(B)(i). Here, as the case progressed, DCS discovered that Father, at times, exercised poor judgment in light of his co-dependent relationship with Mother.  Thus, during the regular meetings to discuss the case plan, DCS repeatedly informed Father that, as a condition to reunification, he needed to address the impact of

his co-dependency on his ability to appropriately parent the children. Specifically, DCS advised Father to work with his therapist on this matter and to discontinue his contact with Mother.

[24] Although the trial court specifically articulated that the "reasons for the removal of the children" are unlikely to be remedied, its finding that Father "demonstrates a co-dependent attitude" suggests that the trial court also considered the reasons for the children's continued placement outside of the home. (Appellant's App. p. 57). Based on the trial court's identification of Father's co-dependency as the lone condition resulting in the children's continued placement outside of the home, we turn to the second step of our analysis, which requires a consideration as to whether there is a reasonable probability that this condition will be remedied.[4] Here, we cannot say that the record clearly and convincingly supports the trial court's conclusion that Father is unlikely to remedy this condition.

[25] The trial court's sparse findings indicate that it did not take into account any evidence of changed conditions or the significant efforts Father made in complying with his DCS services. With respect to the co-dependency, Father's therapist testified that Father regularly attended therapy and made progress in

---

[4] The State contends that Father's "inability to provide [the children] with a safe and stable environment" was also a reason for their continued removal from Father's care. (State's Br. p. 26). We note that DCS and the visitation supervisor testified that they were skeptical of Father's ability to safely parent the children based on a few issues that popped up during Father's visits—such as the fact that El.B. accessed a bucket of paint. However, the trial court's Order does not mention any of these issues in support of its termination decision.

various issues; she testified that it was "significant" that Father had completed the batterer's intervention program and other DCS-recommended classes, and she added that she was "very proud" of Father for finally taking care of some of his own needs because "that's a part of an issue with co-dependency." (Tr. p. 39). However, the therapist also stated that Father had an "unwillingness to really work with the co-dependency and admit that there were co-dependency behaviors." (Tr. p. 32). While the therapist explained that co-dependency "[does not] necessarily mean that you [cannot] parent a child[,]" she believed that Father's history of exercising poor judgment (*i.e.*, allowing Mother to have access to the children) established that his co-dependency would affect his ability to parent. (Tr. p. 44).

[26] Nevertheless, the therapist also testified that she was unaware of any current facts or circumstances that would lead her to think that Father was still involved in a co-dependent relationship with Mother at the time of the termination hearing. Furthermore, even though he had not been permitted to see the children in more than a year, Father continued to attend therapy on a weekly basis. Within the two weeks preceding the termination hearing, the therapist stated that Father had finally begun to address the matter of his co-dependent tendencies. While it is well within the discretion of a trial court to accord less weight to the efforts of parents made only shortly prior to the termination hearing, the trial court in this case entirely disregarded all of the undisputed efforts and progress Father demonstrated throughout the case. *See In re E.M.*, 4 N.E.3d at 643.

As to the trial court's finding that Father admitted to an ongoing sexual relationship with Mother, we are unable to find any evidence of such an admission. Rather, the only evidence indicates that a year prior to the termination hearing, in October of 2014, the visitation supervisor arrived at Father's house in order to conduct an intermittent check, having forgotten that the children were not at Father's home that day. Instead, the visitation supervisor discovered that Mother was there. When the visitation supervisor confronted Father, "with his head hanging low [he] said he'd messed up. He shouldn't have had her there. They should have gone to a hotel. He explained that he was lonely, you know, and wanted to have sex and that's why she was there." (Tr. p. 70). It was around this time that DCS discovered that Father was allowing Mother to visit with the children, and his own visitation rights were subsequently suspended. However, there is nothing else in the record to support a finding of an ongoing sexual relationship. Accordingly, we find that the trial court clearly erred in determining that the conditions leading to the children's removal and continued placement outside the home will not be remedied.

### B. *Threat to Children's Well-Being*

As to whether there is a reasonable probability that the continuation of the parent-child relationship would pose a threat to a child's well-being, a trial court is not obligated to "wait until a child is irreversibly influenced by a deficient lifestyle such that [his or] her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship." *K.E.*,

39 N.E.3d at 649. It is also true that a trial court should not terminate a parent's rights "solely because there is a better home available for the children." *Id.*

[29] Father contends that DCS failed to present any evidence that he poses a threat to the children, and maintains that "speculation that Father might cause harm to the children, without evidence of a pattern of conduct that overwhelms the pattern of responsible behavior Father has demonstrated for several years, is not clear and convincing evidence sufficient to support a decision to terminate Father's parental rights." (Appellant's Br. p. 11). The State, however, asserts that Father has failed to set forth a cogent argument by making bald claims of error. We agree that Father's argument is murky in light of the fact that he combines his arguments regarding any threat to the children's well-being and whether termination is in their best interests. Ordinarily, the failure to develop a cogent argument with proper citations to authority results in a waiver of the issue. *See* Ind. Appellate Rule 46(A)(8)(a). Here, however, with the exception of the scant findings already discussed regarding the remediation of conditions, the trial court simply noted that Father consistently placed his own desires ahead of the children's best interests and failed to issue any additional findings to support a determination that the continuation of the parent-child relationship would pose a threat to the children's well-being. "[T]he certainty of a trial court's decision to terminate a parent's parental rights to his or her child is paramount." *In re V.A.*, 51 N.E.3d at 1144. Based on the complete lack of findings to support its conclusion, the trial court clearly erred.

Furthermore, we cannot say that the evidence clearly and convincingly establishes that Father would pose any threat to the children's emotional or physical well-being. As already discussed, Father complied with all of the services required by DCS in an effort to reunite with the children, and although he had not fully remedied his co-dependency issues, he was still engaged in therapy for this issue at the time of the termination hearing. Father expressed an interest in learning appropriate parenting skills, and he made a consistent effort. Moreover, the evidence established that the children were bonded to Father and he was able to provide the care they needed. *See Bester*, 839 N.E.2d at 149-53 (finding a lack of clear and convincing evidence that the father posed a threat to his child's well-being where the father, in significant part, demonstrated improvements and complied with his reunification plan and interacted lovingly with the child). Father undoubtedly had lapses in judgment with respect to Mother, but the therapist testified that she did not have any information that Father was still maintaining a relationship with Mother. DCS expressed concern that Father needed support in order to apply his parenting skills and that he struggled with implementing structure. There is no dispute that Father made some parenting errors, but no parent is perfect. Certainly any parent, especially a newly-single parent, could benefit from additional support when caring for multiple children, but this evidence does not establish that he would threaten the emotional or physical development of the children. Based on the lack of clear and convincing evidence that there is *either* a reasonable probability that the conditions resulting in the children's removal will not be remedied *or* a reasonable probability that the continuation of the parent-child

relationship poses a threat to the children's well-being, we need not address the remaining elements of the termination statute.

## CONCLUSION

Based on the foregoing, we conclude that the trial court's Order terminating Father's parental rights is clearly erroneous.

Reversed.

Crone, J. and Altice, J. concur